# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br><br>CENTER FOR BIOLOGICAL )<br>DIVERSITY, )<br>                          )<br>           Plaintiff, )<br>                          )<br>       v. )<br>                          )<br>U.S. FISH AND WILDLIFE )<br>SERVICE, _et al._, )<br>                          )<br>          Defendants. )<br>_____) | Civil Action No. 18-0342 (ABJ) |

## MEMORANDUM OPINION

On June 27, 2017, plaintiff Center for Biological Diversity submitted two Freedom of Information Act ("FOIA") requests to the United States Environmental Protection Agency ("EPA") and the United States Fish and Wildlife Service ("FWS"). Compl. [Dkt. # 1]. Plaintiff sought records from both EPA and FWS concerning biological evaluations and biological opinions on certain pesticides under the Endangered Species Act ("ESA"). _Id._ ¶¶ 27, 31, 37, 42.

On February 13, 2018, plaintiff filed this suit, alleging that neither request had received any determination and demanding that the agencies produce the responsive records as required under FOIA, 5 U.S.C. § 552. Compl. ¶¶ 1–2. The agencies processed plaintiff's requests and completed production by December 30, 2019, _see_ Joint Status Report (Jan. 6, 2020) [Dkt. # 31], and the parties filed cross-motions for summary judgment concerning defendants' withholding of certain records pursuant to Exemption 5 of FOIA. _See_ Defs.' Mot. for Summ. J. [Dkt. # 36] ("Defs.' Mot."); Pl.'s Cross Mot. for Summ. J. [Dkt. # 42] ("Pl.'s Cross Mot.").

Defendants rely on declarations from Marietta Echeverria, the Director of the Environmental Fate and Effects Division ("EFED") in EPA's Office of Pesticide Programs ("OPP"), Brian Anderson, Associate Director of the EFED within the Office of Chemical Safety and Pollution Prevention ("OCSPP"), and Karen Myers, the Branch Chief of National Consultations for FWS.[1]   Plaintiff has submitted two declarations from its Government Affairs Director, Brett Hartl.[2]

Upon review of the record, controlling precedent, and for the reasons that follow, the Court will grant defendants' motion in part and enter judgment in their favor with respect to all issues except whether defendant EPA justified its failure to identify any segregable material in two records, and it will deny plaintiff's cross motion with respect to all issues related to whether the records were properly withheld.

## BACKGROUND

### I.  The Endangered Species Act

Congress enacted the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*, in order to protect and preserve endangered and threatened species and "to provide a program for the[ir] conservation." *Id.* § 1531(b).  By enacting the ESA, it was "[t]he plain intent of Congress . . . to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

---

1   Decl. of Marietta Echeverria [Dkt. # 36-2] ("Echeverria Decl.") ¶ 2; Decl. of Brian Anderson [Dkt. # 46-2] ("Anderson Decl.") ¶ 2; Decl. of Karen Myers [Dkt. # 36-3] ("First Myers Decl.") ¶ 1; Suppl. Decl. of Karen Myers [Dkt. # 46-3] ("Second Myers Decl.") ¶ 1.

2   Decl. of Brett Hartl [Dkt. # 42-2] ("First Hartl Decl."); Second Decl. of Brett Hartl [Dkt. # 51] ("Second Hartl Decl.").

Under the ESA, the United States Department of the Interior ("DOI") and the United States Department of Commerce ("DOC") share responsibility for the protection of endangered and threatened species. *See* 16 U.S.C. § 1533(a). Section 7(a)(2) of the ESA mandates that the federal agencies engage in consultation in order to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered" or threatened species. *Id.* § 1536(a)(2).

EPA is required to consult with certain wildlife services ("the Services"), including FWS, before taking an action that "may affect" an endangered or threatened species or its habitat. In this "consultation" process, EPA first makes a "may affect" determination as to whether the listed species or its habitat will be adversely affected by a particular action. *See* 50 C.F.R. § 402.14(a). If an affirmative determination is reached, EPA then releases a report – referred to as a "biological evaluation" – and formal consultation with the Services is required. *Id.* § 402.14(c).

The formal consultation requires the Services to prepare a "biological opinion" in reply, as to whether the proposed action will "jeopardize" endangered or threatened species' existence or detrimentally alter their habitat; the official biological opinion is known as a "jeopardy" or "no jeopardy" biological opinion. *See* 50 C.F.R. § 402.14(h)(1)(iv). Upon the issuance of a "jeopardy" finding to EPA, the agency must implement certain alternatives proposed by the agency (known as "Reasonable and Prudent Alternatives"), seek an exemption pursuant to ESA, or terminate the action. *See* 16 U.S.C. §§ 1536(b)(4), 1538(a), 1536(g).

One action that triggers the consultation process between EPA and the Services is the registration of a pesticide for distribution, sale, and use. *See* 7 U.S.C. §§ 121-136y. Under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), EPA is authorized to regulate these actions "[t]o the extent necessary to prevent unreasonable adverse effects on the

environment," and it restricts the use or sale of pesticides without an EPA registration for a particular use.  7 U.S.C. § 136a(a).

## II.     Factual Background

### A.  Chlorpyrifos, Malathion, and Diazinon Pilot Consultations

Beginning in 2013, EPA and FWS began the process of addressing ESA obligations for pesticide registrations, as required by FIFRA.  In a 2014 report to Congress, the agencies indicated their intent to consider the broad effects of pesticide registrations on all ESA-listed endangered and threatened species.  *See Interim Report to Congress on Endangered Species Act Implementation in Pesticide Evaluation Programs 2*, 21 (2014), available at https://www.epa.gov/sites/production/files/2015-07/documents/esareporttocongress.pdf.   This triggered the consultation process contemplated in section 7 of ESA, and the agencies agreed to a subset of pilot consultations on three pesticides:   chlorpyrifos, malathion, and diazinon.  *See* Exs. 2 & 3 to First Hartl Decl. [Dkt. # 42-2].  In April 2016, EPA released the draft biological evaluations on those three pesticides for public comment,  81 Fed. Reg. 21341 (Apr. 11, 2016), which initiated the formal ESA consultation with FWS in January 2017.

In October 2017, FWS prepared draft biological opinions on chlorpyrifos, malathion, and diazinon, *see* First Hartl Decl. ¶¶ 21–22, including a "Draft Biological Opinion Conclusions" table that the pesticides were likely to jeopardize the listed species.  October 6, 2017 National Pesticide Consultation Email and Briefing PowerPoint, Ex. 19 to First Hartl Decl. [Dkt. # 42-2] ("FWS October 2017 Briefing") at 13.  As required by the ESA, FWS also prepared a "Reasonable and Prudent Alternatives" ("Alternatives") document for its draft biological opinions.  However, the October 2017 FWS draft biological opinions and the Alternatives document were never issued.

### B.   Carbaryl and Methomyl Consultations

After the pilot consultations were underway, defendants began the consultation process for the pesticides carbaryl and methomyl.  In May 2017, EPA released a public handout that stated, "Draft BEs for carbaryl and methomyl are expected to be released soon for public comment." Ex. 14 to First Hartl Decl. [Dkt. # 42-2] ("EPA May 2017 Handout").  But EPA did not release the carbaryl and methomyl draft BEs as scheduled, and drafts BEs on those pesticides were released in March 2020 using a different underlying methodology.

### C.   FOIA Requests

In light of these developments, plaintiff made two FOIA requests seeking what it refers to as the "missing" biological evaluations and opinions:  one to EPA and one to FWS.  Plaintiff's requests to EPA and FWS sought all records mentioning or including "chlorphyrifos, malathion, diazinon, carbaryl, and methomyl," and the corresponding draft and final biological evaluations and opinions under the ESA.  *See* Echeverria Decl. ¶ 5, First Myers Decl. ¶ 8.[3]

Beginning in May 2018, defendants began producing records on a rolling basis, *see* Min. Order (May 7, 2018), and by December 2019, had completed their production of thousands of records.  *See* Joint Status Report (Jan. 6, 2020) [Dkt. # 31] at 1.  EPA produced 848 records, of which 324 were released in part, and it withheld 296 records in full.  Defs.' Statement of Facts [Dkt. # 36] ("Defs.' SOF") ¶ 2, citing Echeverria Decl. ¶ 6.  FWS produced 6,779 records in full or in part, and it withheld 1,451 records in full.  Defs.' SOF ¶ 6, citing First Myers Decl. ¶ 8.

---

3      Plaintiff's request to FWS also sought Geographic Information System ("GIS") data on listed species not at issue in this litigation.

Plaintiff – in an exercise of judgment that the Court deeply appreciates – only challenges the agencies' withholding of seven records:

1. an EPA biological evaluation developmental draft for the pesticide methomyl;

2. an EPA biological evaluation developmental draft for the pesticide carbaryl;

3. an EPA draft excel workbook compiling summaries of data from bee studies;

4. a FWS draft biological opinion and appendices for the pesticide chlorpyrifos;

5. a FWS draft biological opinion and appendices for the pesticide diazinon;

6. a FWS draft biological opinion and appendices for the pesticide malathion; and

7. a FWS two-page draft document on possible "Reasonable and Prudent Alternatives."

Defs.' SOF ¶¶ 3, 7.[4]

Defendants rely on the deliberative process privilege under Exemption 5 of FOIA to justify their withholding of the two 2017 EPA Developmental Draft Biological Evaluations, the Draft Bee Data Excel Workbook, the three 2017 FWS Draft Biological Opinions and their appendices, and the two-page "Alternatives" Document.  Defendants argue that they are not yet final and are undergoing revisions such that if they were released at present, the public would be confused and scientific candor and experimentation among EPA and FWS staff would be "chill[ed]." Defs.' Mot. at 20, 25, 28.

---

4      The three draft biological opinions "consist of a total of 136 separate records, of which defendant FWS has already provided . . . 19 of these records in full, and 4 records in part[,]" to plaintiff.  Defs.' SOF ¶ 8.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 247–48.  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In the FOIA context, "the sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment to be inappropriate.  *Weisberg v. DOJ*, 627 F.2d 365, 371 n.54 (D.C. Cir. 1980), quoting *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979) (internal quotation marks omitted).

"[S]ummary judgment may be granted on the basis of agency affidavits" in FOIA cases, when those affidavits "contain reasonable specificity of detail rather than merely conclusory

statements," and when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013), quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006).   A plaintiff cannot rebut the good faith presumption afforded to an agency's supporting affidavits through "purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

In a FOIA case, the burden rests with "the agency to sustain its action," *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981), and "the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).   The district court reviews an agency's decisions *de novo*.   5 U.S.C. § 552(a)(4)(B).

## ANALYSIS

To prevail in a FOIA action, an agency must first demonstrate that it has made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  Second, the agency must show that whatever "materials that are withheld . . . fall within a FOIA statutory exemption." *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 252 (D.D.C. 2005).  Any "reasonably segregable" information in a responsive record must be released, 5 U.S.C. § 552(b), and "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

One of the nine exemptions available under FOIA – Exemption 5 – permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]"   5 U.S.C. § 552(b)(5). It encompasses the deliberative process privilege, which protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001), quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). This privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and its purpose "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9, quoting *Sears*, 421 U.S. at 151.  To accomplish that goal, "[t]he deliberative process privilege protects agency documents that are both predecisional and deliberative." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006), citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

A document is predecisional if "it was generated before the adoption of an agency policy," and it is deliberative if "it reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866.   "[R]ecommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency[ ]" all qualify as deliberative. *Id.*

In 2016, Congress amended FOIA to add an additional requirement:  records that are otherwise protected from disclosure under an exemption must be released unless the agency "reasonably foresees that disclosure would harm an interest protected by the exemption."  5 U.S.C. § 552(a)(8)(A)(i); *see also Judicial Watch, Inc. v. U.S. Dep't of Justice*,

2019 WL 4644029, at *3 (D.D.C. Sept. 24, 2019).  This "reasonable foreseeability of harm" standard requires the withholding agency to provide "context or insight into the specific decision-making processes or deliberations at issue, and how in particular they would be harmed by disclosure" of the contested records.  *Id.*, at *5.

Finally, once a defendant has properly asserted a FOIA exemption, it still must release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  The agency bears the burden of demonstrating that no reasonably segregable material exists in the withheld documents.  *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993).  "[T]he agency must provide a 'detailed justification' for its non-segregability but need not 'provide so much detail that the exempt material would be effectively disclosed.'"  *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 376 F. Supp. 3d 47, 75 (D.D.C. 2019), quoting *Mead Data Ctr.*, 566 F.2d at 242.

Here, defendants rely on the deliberative process privilege to justify their withholding of the April 2017 developmental draft biological evaluations, the draft bee data excel workbook, the October 2017 draft biological opinions, and the two-page "Alternatives" document, stating that the contents of these documents are predecisional and deliberative in nature.  As to the harm that would ensue if the records are released to the public, defendants emphasize the "public confusion" that would result, Defs.' Mot. at 23–25, 28, and cite the "chilling effect" release might have on their scientists' ability to "freely exchang[e] and test[] ideas [and] methods" and "analyz[e] preliminary results."  *Id.* at 28.

I.      **April 2017 EPA Developmental Draft Biological Evaluations for Carbaryl and Methomyl**

    A. **The developmental draft biological evaluations are predecisional and deliberative.**

EPA's biological evaluation ("BE") encompasses a complex analysis that includes more than "a simple 'may affect' finding for listed species."  Echeveria Decl. ¶ 8.  EPA's declarant explains that a BE is a:

> comprehensive document that presents to the Services EPA's assessment of the manner in which the FIFRA registration action may affect a species or habitat, along with detailed descriptions of the species, habitats, and geographic areas that may be affected and EPA's reviews of the best available scientific and commercial information, relevant biological studies and literature reviews.

*Id.*  She adds that the creation of a BE has three distinct phases "used to describe where a particular iteration of a BE for pesticide registration actions is in the development process."  *Id.* ¶ 9.

> A "developmental draft BE" is an iteration of a BE that is still under internal development by EPA.  A "draft BE" is the version of a BE that has been released by EPA for public comment.  A "final BE" is the version of a BE that is submitted to the Services after public comments have been received and considered by EPA.

*Id.*  She avers that the two biological evaluations for the pesticides carbaryl and methomyl at issue in the case are developmental draft BEs.  *Id.*

Plaintiff has not yet had access to these materials.  It characterizes the two documents as "Final Draft Biological Evaluations," and submits that because the BEs represent what the agency was "about to release to the public," these "polished records . . . contain[ing] expert conclusions" do not fall under the deliberative process privilege.  Pl.'s Cross Mot. at 26.

EPA maintains that, notwithstanding their level of polish, the two developmental draft BEs fall under the deliberative process privilege because they "died on the vine."  Defs.' Reply & Mem. in Supp. of Defs.' Mot. for Summ. J. [Dkt. # 46] ("Defs.' Reply") at 10, citing *Nat'l Security*

*Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014).  Along with BEs for chlorpyrifos, diazinon, and malathion, the carbaryl and methomyl BEs were originally drafted using what the agency refers to as the "Interim Methods."  Echeverria Decl. ¶ 10.  However, after reviewing the public's comments on the 2016 pilot release of draft BEs for chlorpyrifos, diazinon, and malathion, the agency determined it needed to revise its approach to the forthcoming BEs in three respects:

> (1) the earlier Interim Methods did not meaningfully distinguish species that are likely to be exposed to and affected by the assessed pesticides from those that are not likely; (2) the resources needed to sustain the level of effort was too high; and (3) the amount of documentation produced was too great for the public to review and comment upon in a reasonable timeframe.

*Id.* ¶ 15.

Based on this recommendation, the carbaryl and methomyl BEs underwent significant revisions, and the April 2017 developmental draft BEs for carbaryl and methomyl were never approved for release.  Echeveria Decl. ¶¶ 16–19.  In March 2020, the agency released carbaryl and methomyl draft BEs – generated using the "Revised Methods" – for public comment.  *Id.* ¶ 19.

The Supreme Court recently addressed the question of the applicability of Exemption 5 to drafts prepared pursuant to section 7 of the ESA.  *U.S. Fish and Wildlife Servs. v. Sierra Club, Inc.*, 209 L. Ed. 2d 78 (2021).  In that case, the Sierra Club filed FOIA requests for records related to the EPA's consultation with FWS and the National Marine Fisheries Service ("NMFS"), regarding proposed rulemaking for the design and operation of certain "cooling water intake structures."  *Id.* at 84.  In response to EPA's consultation initiation, FWS and NMFS (together, "the Services") prepared draft biological opinions that concluded the proposed rule would jeopardize listed species and "identified possible reasonable and prudent alternative that the EPA could pursue."  *Id.* at 85.  These drafts were never approved, and the agencies agreed to extend the

period of consultation.  In March 2014, EPA supplied the Services with a significantly altered proposed rule, after which the Services issued a "no jeopardy" final biological opinion.  *Id.*

At issue before the Supreme Court was whether the draft biological opinions from the Services were covered under the deliberative process privilege:  defendants maintained that the drafts could be withheld since they were "necessarily nonfinal."  *Sierra Club*, 209 L. Ed. 2d at 85. The Court noted that "whether an agency's position is final for the purposes of the deliberative process privilege is a functional rather than formal inquiry[,]" *id.* at 90, and it "shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *Id.* at 85.  It emphasized that courts needed to analyze whether a draft "communicates a policy on which the agency has settled[,]" rather than merely "whether a document is last in line[.]" *Id.* at 87.  The Court found that the privilege covered the requested records, stating that "the determinative fact" in finding that the agency policy was non-final was "not their level of polish," but rather "that the decisionmakers at the Services neither approved the drafts nor sent them to the EPA." *Id.* at 89.

In light of *Sierra Club* and this Circuit's existing precedent, the Court finds that the April 2017 carbaryl and methomyl developmental draft BEs are properly characterized as drafts, and therefore, they are predecisional.  *See Nat'l Security Archive*, 752 F.3d at 463 ("[A] draft [that] died on the vine . . . is still a draft . . . [t]hose kind of documents are no less drafts than the drafts that actually evolve into final . . . actions.").  The EPA declaration outlines the full scope of considerations weighed by agency decisionmakers "leading up to the decision to delay publication of the developmental draft BEs for Carbaryl and Methomyl[,]" which included "interpreting scientific literature, choosing appropriate toxicity endpoints, determining whether or not a species is likely to be exposed to and affected by the pesticides being evaluated, and whether or not and

how to include probabilistic analyses in the draft BEs."  Echeverria Decl. ¶ 22.  Based on the declaration, it is clear that EPA scientists were still engaged in the detailed process of deciding what specific analyses to execute and include in the drafts BEs.

Applying the functional test set out in *Sierra Club*, the Court is compelled to find that the April 2017 drafts do not communicate a policy on which the agency has settled.  They may have been close to publication, but until the agency approved them or disseminated them as the next step in the process, the developmental drafts remained subject to revision and were thus predecisional.[5]

The documents are also deliberative.  Plaintiff argues that the deliberative process privilege cannot shield the developmental drafts BEs because they contain scientific facts and conclusions rather than the policies protected under Exemption 5.  Pl.'s Cross Mot. at 30–33.  Plaintiff directs the Court to non-binding case law stating that these kinds of drafts "are not open to discretionary decisionmaking."  *Id.* at 32, citing *Nw. Envtl. Advocates v. EPA*, No. 05-1876-HA, 2009 WL 340732, *7 (D. Or. Feb. 11, 2009).[6]  However as courts in this circuit have noted,

---

[5]     Plaintiff suggests that the carbaryl and methomyl developmental draft BEs should have been released to the public because the draft BEs for chlorpyrifos, malathion, and diazinon were released in 2016 as part of the pilot consultation process.  Pl.'s Cross Mot. at 24.  But the D.C. Circuit rejected this argument in *Army Times Publ'g Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993), where the Air Force did not "'waive' its right to claim an exemption from disclosure simply because it has released information similar to that requested." *Id.* at 1071; *see also Nat'l Sec. Archive*, 752 F.3d at 464 ("[A]n agency does not forfeit the benefit of a FOIA exemption simply because of its prior decision to voluntarily release other information.").

[6]     While plaintiff is correct that "material that is purely factual" would not be considered deliberative, *see In re Sealed Case (Espy)*, 121 F.3d 729, 737 (D.C. Cir. 1997), courts in this district have held that the EPA's "may affect" determination under the ESA is deliberative because both "determining what information to include and how to assess that information is . . . deliberative." *Cent. for Bio. Diversity v. EPA*, 369 F. Supp. 3d 1, 19 (D.D.C. 2019) (citing other courts that have "reached the same conclusion that the deliberative process privilege is available for records associated with EPA's actions under ESA's section 7(a)(2)").

decisionmaking that "reflect[s] the collection, culling and assessment of factual information or scientific data" is of a kind that is clearly covered by the deliberative process privilege. *Ctr. for Bio. Diversity v. EPA*, 369 F. Supp. 3d 1, 20 (D.D.C. 2019) (collecting cases).

**B. EPA sufficiently outlined the foreseeable harm posed by release of the development draft biological evaluations.**

To comply with section 552(a)(8)(A), defendants assert that disclosure of the developmental draft BEs from 2017 would result in public confusion. Echeveria Decl. ¶ 23. Because the agency now relies on the Revised Methods in generating its draft BEs, rather than the Interim Methods, it submits that release of the developmental drafts BEs would misrepresent its decision and could "damage the Agency's ability to receive robust public review and comment of the 2020 draft BEs that have now been released." Echeverria Decl. ¶ 23.

This satisfies defendants' obligation to particularize how release would implicate the interests protected by the deliberative process privilege.

**C. EPA did not support its assertion that portions of the developmental draft biological evaluations could not be segregated.**

"[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007). Any reasonably segregable portion of a withheld record must be released by the agency, unless the non-exempt portions are "inextricably intertwined with exempt portions" of the record. *Mead Data Ctr.*, 566 F.2d at 260; *see also Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002).

"In order to demonstrate that all reasonably segregable material has been released, the agency must provide a 'detailed justification' for its non-segregability," although "the agency is not required to provide so much detail that the exempt material would effectively be disclosed."

*Johnson*, 310 F.3d at 776, citing *Mead Data Ctr.*, 566 F.2d at 261.   Just is the case with other

aspects of the FOIA analysis, "[a]gencies are entitled to a presumption that they complied with the

obligation to disclose reasonably segregable material," *Sussman*, 494 F.3d at 1117, citing *Boyd v.*

*Criminal Div. of DOJ*, 475 F.3d 381, 391 (D.C. Cir. 2007), and "[a] court may rely on government

affidavits that show with reasonable specificity why documents withheld pursuant to a valid

exemption cannot be further segregated."  *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008), citing

*Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).

Defendants assert that the two developmental draft BEs "have been properly withheld in

full because no meaningful, non-exempt information could be segregated from them."  Defs.' Mot.

at 17.  Plaintiff maintains that some portion of the developmental draft BEs must be segregable,

because they contain a great deal of factual information, and the records "were polished and ready

to be published for public comment."  Pl.'s Cross Mot. at 33.

The declarant avers that the release of the factual information contained in the documents

would expose what transpired in deliberations between the 2017 developmental draft BEs and the

draft BEs issued in March of 2020.  "Any language used in these 2017 developmental drafts that

remain in the 2020 draft BEs that were publicly released are interspersed throughout these draft

documents making such language inextricably intertwined with privileged information."

Echeverria Decl. ¶ 25.  That may be a legitimate basis for shielding information from review.  But

the EPA also emphasizes the impracticability of going through the 2017 developmental draft BEs

line-by-line to determine what could be released:  "[T]hese documents are not further segregable

in any reasonable or meaningful way in light of their immense length (thousands of pages) and

complexity."  *Id*.  In light of these considerations, defendants argue that the agency is "entitled to

the presumption that they have produced all reasonably segregable, non-exempt information." Defs.' Reply at 16.

While the Court recognizes that the agency faces a daunting task, this showing does not satisfy defendants' burdens because both the *Vaughn* Index and the declaration rely on blanket assertions, *see* EPA *Vaughn* Index, Echeverria Decl. ¶¶ 24, 35, and defendants point to no FOIA precedent that authorizes the Court to relieve an agency from this obligation on the grounds that it would be too burdensome.  *See Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 19 (D.D.C. 2004) ("[A] blanket declaration that all facts are so intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of non-segregability."). Agencies must "specify in detail which portions of the document are disclosable and which are allegedly exempt," and here, defendants wholly failed to supply the requisite detail.  *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973); *see also King v. United States Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987) ("[T]he withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'"); *Kimberlin v. DOJ*, 139 F.3d 944, 950 (D.C. Cir. 1998) ("Neither the [plaintiff] nor the court . . . is obliged to accept [defendants'] conclusion[s] without more specification.").

For these reasons, while the Court will enter summary judgment in favor of the defendants and deny plaintiff's motion on the question of whether the records are exempt, the agency must produce a redacted version disclosing purely factual information, or other materials that can be segregated, within thirty days of the date of this opinion, or submit a more detailed explanation as to why that would be impossible.

## II.      Draft Bee Data Excel Workbook

### A.  The Workbook is predecisional and deliberative.

Defendants' search for records responsive to plaintiff's FOIA request also returned an excel workbook ("Workbook") that includes "bibliographical lists" of bee toxicity studies and study summary data.  Defs.' Mot. at 20; *see also* Echeverria Decl. ¶ 26–27.  According to the agency's declarant, the "workbook at issue represents an early stage in the development of [a potential future EFED] database."  *Id.* ¶ 27.

The Workbook was deemed responsive because it includes the Master Record Identification Numbers ("MRIDs") for carbaryl and methomyl, despite the fact that its contents do not relate to the development of draft BEs for either pesticide.   Echeverria Decl. ¶¶ 26, 28.  Defendants' state that because the Workbook was merely an early developmental draft "used for scoping out the potential work involved" for a future project, the deliberative process privilege is applicable.  *Id.* ¶ 26.  Defendants' declarant also avers that the Workbook contains "extensive dialog in the form of comments . . . between two reviewers" involved in its development.  *Id.* ¶ 32.

Plaintiff's only challenge to defendants' assertion that the Workbook is a predecisional and deliberative draft used to inform EPA's future bee projects is its statement that it is "simply a database."  Pl.'s Cross Mot at 30.  The Court cannot apply this formal, rather than functional, inquiry proposed by plaintiff.  *See Sierra Club*, 209 L. Ed. 2d at 90.  The creation of a database involves choices about what to include and how to display the information, and a draft represents an ongoing effort to apply certain methodologies and to continue evaluating underlying data, and it is usually deliberative. *Cal. Air Res. Bd. v. EPA*, 2020 WL 2934914, at *12 (D.D.C. June 3, 2020), citing *Coastal States Gas Corp.*, 617 F.2d 854, 866 (D.C. Cir. 1980).  For these reasons, the spreadsheet is deliberative and was properly withheld.

**B. EPA sufficiently explained the foreseeable harm posed by release of the Workbook.**

Plaintiff asserts that defendant EPA relies on "boilerplate assertions of harm" in order to withhold the Workbook from disclosure; namely, that release of the Workbook would "have a chilling effect on Agency staff's ability to have open and frank discussions weighing, considering, and evaluating scientific data, studies, reports, and other relevant information[.]" Echeverria Decl. ¶ 33. *See Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (Agencies "cannot simply rely on generalized assertions that disclosure could chill deliberations.") (internal quotation marks omitted).

But EPA's declarant provided more detail about the specific kind of harm that would occur if the Workbook was not withheld, as "[t]his version of the workbook is incomplete and has not been reviewed for relevance, quality or accuracy." Echeverria Decl. ¶ 31. The declaration adds that "release of this workbook in draft form would result in public confusion regarding the Agency's final decisions" and "would expose what occurs in the deliberative process between the creation of the draft and the issuance of the final database." *Id.* ¶¶ 33, 35.

Because EPA outlined more than a "generalized assertion" of foreseeable harm by explaining the specific concerns of releasing a draft excel document with staff comments that has not been reviewed for accuracy, it has permissibly withheld the Workbook.

**C. EPA properly concluded that the Workbook is not segregable.**

Regarding segregability of the Workbook, plaintiff posits that the agency is being untruthful about the comments exchanged between EPA employees within the Workbook, and it suggests that "those comments can be redacted." Pl.'s Cross Mot. at 30. In the absence of any

showing of bad faith,[7] the Court relies on the contents of the *Vaughn* index and the agency

declaration that the commentary is not segregable from the rest of the Workbook.  *See Johnson v.*

*Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776–77 (D.C. Cir. 2002).

Also the agency's declarant described the nature of the comments contained in the

workbook, which "represent initial deliberations between [Echeverria's] staff prior to sending the

document through the management chain for scoping a contract work plan and ultimate project

approval."  Echeverria Decl. ¶ 31.  She added that the Workbook is not segregable even if the staff

comments were removed from the cells of the excel spreadsheet, because "the differences in the

information portrayed in this draft workbook consist largely, if not wholly, of differences in the

method of explanation and organization of text, rather than differences in the underlying facts from

the studies they are derived from."  *Id.* ¶ 35.

Therefore, the Court finds that the agency properly withheld the Workbook from disclosure

under Exemption 5, and it will grant summary judgment in favor of defendants on this claim.

### III.   October 2017 FWS Draft Biological Opinions for Chlorpyrifos, Malathion, and Diazinon

#### A.  The draft biological opinions are predecisional and deliberative.

In support of the FWS withholdings pursuant to Exemption 5, the agency's declarant

explains:

> In the ESA consultation requirement for action agencies, records relating to
> EPA's biological evaluation and FWS' early drafts of the three biological
> opinions like the ones at issue in plaintiff's FOIA request, there are
> numerous decision points in which a wide array of FWS and EPA
> participants confer, share ideas, opinions, and develop options for the
> consideration of decision-makers.  FWS' analysis is case-specific to the

---

7   Agency declarations are generally accorded "a presumption of good faith," *SafeCard Servs.*, 926 F.2d at 1200, and so *in camera* review of a contested draft is not necessary where "[p]laintiff has provided no factual basis for questioning the agency's declarations."  *Cal. Air*, 2020 WL 2934914, at *13 n.4.

> particular species and pesticide at issue, with FWS experts making numerous policy judgments during the development of the draft biological opinions (not yet finalized).  The documents being withheld subject to the Plaintiff's FOIA request relate to numerous decision points in this process[.]

First Myers Decl. ¶ 12.  She outlined that the withheld portions of the documents are predecisional because they were created in preparation to draft the biological opinions "which are still under development," and deliberative because they contain the "thoughts, ideas and opinions of FWS staff about the draft biological opinion[s,]" including "internal discussions . . . reflect[ing] advice, analyses, suggestions, and recommendations concerning the content of the draft product." *Id.* ¶ 13.

Some of the responsive records for the three FWS biological opinions were labeled "Final Draft [Biological Opinion]" on October 31, 2017.[8]  Plaintiff contends that the three draft biological opinions for chlorpyrifos, malathion, and diazinon are necessarily final because they were labeled as such by the agency.  *See* Pl.'s Cross Mot. at 14.

Defendants' declarant responds that the labeling of these documents as "final" was not because they were ready for release back to EPA, but rather because they were the "latest versions of the assembled draft documents."  Second Myers Decl. ¶ 5.  Furthermore, defendants aver that the draft biological opinions are being revised to incorporate "additional sources of usage data for consideration in its analyses." *Id.* ¶ 2.

Plaintiff urges the Court to reject defendants' "post-hoc" and "self-serving" justification for classifying these records as drafts.  Pl.'s Cross Reply at 12.  But here again, plaintiff is asking the Court to apply the formalistic test recently rejected by the Supreme Court in favor of a functional test.  *See Sierra Club*, 209 L. Ed. 2d at 90.

---

8      *See also* First Hartl Decl. ¶ 15; Exs. 5 & 6 to First Hartl Decl. [Dkt. # 42-2]; and Pl.'s Reply in Supp. of Cross Mot. [Dkt. # 49] ("Pl.'s Cross Reply") at 12.

In *Sierra Club*, the Court "did not foreclose the possibility that a draft biological opinion is final." 209 L. Ed. 2d at 88 n.4.  It opined that a draft biological opinion might be considered final – and therefore no longer predecisional – if the Services treated it as final, for instance, by making it "clear that they would not incorporate into that opinion responses made by the action agency, as to reasonable and prudent alternatives or other matters." *Id.*, discussing 50 C.F.R. § 402.14(g)(5).

The declarant explains that the decision to revise the data collected and used in FWS's analyses was reached after a draft of the biological opinion was released to "internal agency and DOI (e.g., Solicitors) reviewers." Second Myers Decl. ¶ 2.[9]  This period – after a draft biological review is nearly finalized by the Services but before a final version is issued to the EPA – is exactly the sort of process that the Supreme Court emphasized "specifically contemplates further review . . . [because of] the possibility of changes to the biological opinion *after* the Services send the agency the draft." *Sierra Club*, 209 L. Ed. 2d at 88 (emphasis in original).

And here, changes were made to the methodology to be employed in the opinions as a result of the "review of these initial draft[s]." Second Myers Decl. ¶ 2.  This underscores defendants' assertion that the two draft biological opinions – whatever they were titled – were functionally drafts because they left "agency decisionmakers free to change their minds."

---

9       Plaintiff's argument that the draft biological opinions cannot still be considered in review because a senior EPA advisor thanked FWS for "the opportunity to view the draft Biological Opinions" is unconvincing.  Pl.'s Cross Reply at 7.  The regulations require that the Services must make a draft available to EPA before issuing a final biological opinion.  50 C.F.R. § 402.14(g)(5); *see also Sierra Club*, 209 L. Ed. 2d at 90 (Breyer, J., dissenting).

*Sierra Club*, 209 L. Ed. 2d at 87 (internal quotation omitted).  Therefore, the Court finds the two draft biological opinions were predecisional and deliberative in nature.[10]

### B.  FWS sufficiently explained the foreseeable harm posed by release of the draft biological opinions.

The arguments regarding the foreseeable harm posed by release of the FWS draft biological opinions are nearly identical to those offered concerning the EPA's developmental draft BEs. Defendants argue that their release would have a "chilling effect" on ongoing deliberations within the agency and cause "public confusion" if the final position of FWS does not resemble "the preliminary and exploratory information in the current records."  First Myers Decl. ¶ 13. Plaintiff states these are basically final drafts that are not subject to change, and there is no chance of chill or confusion because the FWS policy is set.

The declaration states with specificity:

> The withheld portions or the entire withheld record reflect the thoughts, ideas and opinions of FWS staff . . . [and] contains exploratory analysis of data which allows the FWS to educate themselves about the data and evaluate different analysis techniques.  In most instances, FWS scientists shared these records with each other throughout the deliberative process of selecting the data and information they wanted to convey while drafting the various documents for review and consideration of potential applicability to the components of the draft biological opinion.  The internal discussions are deliberative because they reflect internal advice, analyses, suggestions, and recommendations concerning the content of the draft product and do not reflect final decisions regarding the development of the draft biological opinions.  Similarly, the documents that consist of the appendices . . . reflect preliminary analyses, the compilation of data and certain factual

---

10      The Court certainly understands why plaintiff and the public would have an interest in the multiple iterations of the important studies and recommendations.  But that interest conflicts with the interest the deliberative process privilege is designed to protect:  the agency's need to debate policy alternatives fully before they are formalized and disseminated.  There will be opportunities for public notice and comment after the agency decides what its final recommendation will be before any formal policy is promulgated.  Moreover, the Court notes that its ruling in this FOIA case does not address the question of whether the privilege – which is a qualified one, *see Espy*, 121 F.3d at 737–38 – could be overcome in future litigation, based on a different record and different legal standards, concerning the reasonableness of the ultimate policy decision.

> information identified through the exercise of scientific judgment, interpretation of technical data provided for consideration to others for further development, and redevelopment of models used to analyze scientific data important to providing greater assessment of effects to individual species.

First Myers Decl. ¶ 13.  This goes well beyond a merely formulaic recitation of the elements of the privilege, and defendants' decision to withhold the records will be upheld.

### C.  FWS properly concluded that the draft biological opinions are not segregable.

The agency conducted a line-by-line review of the documents to determine whether any information was segregable, and it determined that release of a portion of the records would reveal "the nature of the deliberative communication or itself reflect the deliberative process of compiling information deemed relevant at this preliminary stage[.]"  First Myers Decl. ¶¶ 14–15.  Courts in this district have held that "a statement representing that a 'line-by-line' search was conducted" together with "sufficiently detailed *Vaughn* index and declarations" satisfies an agency's showing on segregability of a record.  *ViroPharma v. HHS*, 839 F. Supp 2d 184, 195–96 (D.D.C. 2012).

In addition, defendant FWS has not withheld all records in their entirety, but has released some in part to the extent possible.  First Myers Decl. ¶ 14.  These portions included sections such as the "Consultation History," "Description of the Action," and some example draft analysis summaries.  *Id.* ¶ 3.  Regarding what portions it has not released, it explained the rationale underlying the withholdings for each of the separate draft biological opinions for chlorpyrifos, malathion, and diazinon and their appendices.  *See id.* ¶¶ 18(a)–j.

Based on its review of the declarations and the level of detail included in the *Vaughn* index, the Court finds that defendant FWS provided all reasonably segregable material to plaintiff, and therefore summary judgment will be granted for defendant FWS on these three draft biological opinions.

IV.     "Alternatives" Document

A.  The Alternatives document is predecisional and deliberative.

FWS drafted the Alternatives document in advance of issuing draft biological opinions to EPA that found that chlorpyrifos, malathion, and diazinon would jeopardize listed species, and it included proposed recommendations for potential mitigating actions.  The agency's declarant explains that the Alternatives document "is deliberative because it provides preliminary recommendations for potential actions should such alternatives be needed," and it is predecisional because "in such a case[, it] would undergo additional analysis and further development with the action agency later in time."  First Myers Decl. ¶ 13

Plaintiff does not directly challenge whether the Alternatives document is predecisional and deliberative; its dispute here is limited to whether there is foreseeable harm if the document is released.  Because a document containing recommendations prepared for decision and review by senior leadership is "a classic example of a deliberative document," *Abtew v. DHS*, 808 F.3d 895, 899 (D.C. Cir. 2015), the Court concludes that the Alternatives document is covered by the Exemption 5 deliberative process privilege.

B.  FWS sufficiently outlined the foreseeable harm posed by release of the Alternatives document.

Defendants' *Vaughn* index states that the draft document at issue here "predates an agency decision on the matter."  Ex. A to [Dkt. # 36-3] ("FWS *Vaughn* Index") at 11.  The declarant emphasizes that "[t]he suggested activities or criteria were provided for discussion and deliberation by FWS staff" in advance of a "jeopardy" decision, but would not be required if the opposite conclusion was reached.  First Myers Decl. ¶ 13.  Defendants argue that because reasonable and prudent alternatives that were included may change if the future biological opinion results change, it would cause public confusion if released.  *See* Defs.' Mot. at 24, citing First Myers Decl. ¶ 13.

Although defendants arguably could have provided more detail regarding the potential harm, "the degree of detail necessary to substantiate a claim of foreseeable harm is context-specific." *Rosenberg v. U.S. Dep't of Defense*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020). And since the document is so short, and so closely linked to the deliberations over the draft biological opinions' jeopardy determination, there is little that an additional explanation would, or could, have provided. *See, e.g.*, *Nat'l Immigration Project of Nat'l Lawyers Guild v. ICE*, No. 17-cv-02448 (APM), 2020 WL 5798429, at *5 (D.D.C. Sept. 29, 2020) (discussing that given the preliminary nature of the drafts at issue and the somewhat self-evident effects of public disclosure, the agency met its burden under section 552(a)(8)(A)). The Court finds this explanation sufficient to establish foreseeable harm.

### C. FWS properly concluded that the Alternatives document is not segregable.

The Alternatives document is only two pages long, and a portion of the document has been redacted and released to plaintiff. First Myers Decl. ¶ 19. Based on that fact, and the conclusion that the information in this document is of the sort protected by the deliberative process privilege, the Court concludes that the agency is entitled to a presumption that is has produced the segregable portions.

**CONCLUSION**

For these reasons, the Court will **GRANT** defendants' motion in part and enter judgment in their favor with respect to all issues except whether defendant EPA justified its failure to identify any segregable material in two records, and it will **DENY** plaintiff's cross motion with respect to all issues related to whether the records were properly withheld.[11]   The sole remaining segregability question remains under advisement pending further action by the EPA.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE: March 31, 2021

---

11      On March 5, 2021, defendants filed a two-page notice informing the Court that the Supreme Court had reached a decision in *Sierra Club*, Defs.' Notice of Suppl. Authority [Dkt. # 53], and plaintiff filed a five-page response on March 8, 2021.  Pl.'s Resp. to Defs.' Notice [Dkt. # 54].  On March 18, 2021, defendants filed a motion to strike plaintiff's response, which plaintiff opposed.  Defs.' Mot. to Strike [Dkt. # 55]; Pl.'s Mem. in Opp. to Mot. to Strike [Dkt. # 57].  The Court finds that it was entirely appropriate for the parties to bring the recent decision to its attention, but it also points out, that as with cases cited in the parties' memoranda, it relies on the authorities themselves, and not the parties' characterizations of them, in reaching its decisions.  So plaintiff may have said more than was called for at the time, but the motion to strike, which was entirely unnecessary, will be denied.